UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TAMMY JOHNSTON, | : | Case No. 1:10-cv-444 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND NOT SUPPORTED BY SUBSTANTIAL EVIDENCE, AND REVERSED; (2) THIS MATTER IS REMANDED TO THE ALJ UNDER THE FOURTH SENTENCE OF 42 U.S.C. § 405(g); AND (3) THIS CASE IS CLOSED**

This case is before the Court on Magistrate Judge's Bowman's Report and Recommendation (Doc. 18), Plaintiff's objections (Doc. 22), and the Commissioner's response (Doc. 25). For the reasons indicated herein, the Court declines to adopt the Magistrate Judge's Report and Recommendations, **REVERSES** the decision of the Commissioner to deny Tammy Johnston SSI benefits, and **REMANDS** this case for further proceedings consistent with this Order.

I.

On July 12, 2005, Plaintiff filed an application for SSI alleging a disability onset date of October 19, 1999, due to bipolar disorder with severe anxiety, COPD, chronic knee pain, a skin disorder, and borderline intellectual functioning. (Tr. 60-62, 70, 90, 99, 114-115, 117, 130, 132, 141-149, 157).

Upon denial of her claims at the state agency levels, Plaintiff requested a hearing *de novo* before an ALJ. (Tr. 26). A hearing was held on August 29, 2008, at which Plaintiff and a vocational expert testified. (Tr. 26).

On November 13, 2008, the ALJ entered his decision finding Plaintiff not disabled. (Tr. 13-24). That decision became the final determination upon denial of review by the Appeals Council. (Tr. 6-9). Plaintiff then timely filed an appeal with this Court.

Plaintiff is 46 years old. (Tr. 23). She has a sixth grade education[1] and no past relevant work history. (Tr. 23, 70, 90, 99, 114-115, 117, 130, 132, 141-149, 157).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1. The claimant has not engaged in substantial gainful activity since July 8, 2005, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: depression, borderline intellectual functioning, and COPD/chronic bronchitis (20 CFR 416/921 *et seq.*).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416/925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416/967© except: limited to lifting/carrying 50 pounds occasionally and 25 pounds frequently; avoid concentrated exposure to pulmonary irritants such as dust, fumes, gases, and chemicals; limited to

---

[1] Plaintiff explained that she grew up with an abusive, alcoholic father, and that she quit school because she was embarrassed by him. (Tr. 322, 337, 362, 367).

        simple, routine, repetitive tasks without a constantly rapid pace; limited to minimal interaction with co-workers, supervisors, and the general public.

5.      The claimant has no past relevant work (20 CFR 416/965).

6.      The claimant was born on February 14, 1966 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416/963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since July 8, 2005, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18-24).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to SSI. (Tr. 24).

Plaintiff's objections to the Magistrate Judge's Report and Recommendations are as follows: (1) under the particular circumstances of this case, it was unreasonable for the ALJ to refuse IQ testing to determine if Plaintiff was mentally retarded; (2) the ALJ's decision was not supported by substantial evidence, either regarding his decision that Plaintiff did not manifest at least two deficits in adaptive functioning prior to age 22 or his decision that Plaintiff has the functional capacity to perform and sustain work at the

-3-

level alleged; and (3) the ALJ improperly evaluated Plaintiff's credibility and failed to evaluate the credibility of Plaintiff's brother. The Court will address each objection in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, she must present sufficient evidence to show that, during the relevant time period, she suffered an

impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The basic facts of this case do not appear to be contested. The Court reiterates the facts most relevant to Plaintiff's objections.

After the hearing before the ALJ, Plaintiff was able to obtain and submit her school records from the school board of Hillsborough County, Florida. (Tr. 140-152). The records reflect that Plaintiff has consistently performed very poorly in the academic sphere. While IQ testing from that time period was not available, standardized testing results show that Plaintiff generally performed at the 2nd to 4th stanine levels. (Tr. 143-146). In fact, during testing in 1980, when Plaintiff was 14 years old, she scored at the mental age of 7 years 3 months in language skills and 10 years 11 months in non-language skills, for a total mental age of only 9 years. (Tr. 144). She repeated 1st and 5th grades and quit school after the 6th grade. (Tr. 141, 143). Additionally, Plaintiff reads at approximately the 2nd grade level. (Tr. 144).

Plaintiff testified that she lives with her two daughters in an apartment in Hamilton, Ohio. (Tr. 378-379). She testified that she was in special education classes while in school, and only completed the 6th grade; she has not attained a GED. (Tr. 379). Plaintiff testified that she cannot read or write very well, and at times cannot understand what she reads. (Tr. 387, 398-399). In fact, when asked whether she could read a newspaper, Plaintiff responded that she can read some "small papers" which she clarified

were "little happy notes" that her daughter will write to her, saying things such as "I love you, mom." (Tr. 398-399). Although Plaintiff has a driver's license, she testified that she believes she took the oral test (although she could not remember definitively). (Tr. 387).

Plaintiff explained that she does not travel independently and that she instead relies on her adult daughters. (Tr. 389-400). She testified that she can add "some," she doubted she could subtract, and she could not multiply or divide. (Tr. 400). Plaintiff explained that her elder daughter handles the payment of bills, and when Plaintiff's children were younger, she relied upon her brother and her ex-husband to handle the bills (*Id.*) Plaintiff did not directly answer a question regarding whether she knows how to count change and if she understands how much change she should get back, but instead responded that she never counts the change, but simply puts it in her purse and moves on. (Tr. 391). Plaintiff stated that she "might be able" to tell whether she had received correct change "if she had to" (*Id.*)

Plaintiff explained that her daughters keep a record of her doctors' appointments and remind her when they come up and also remind her on a daily basis to take her medications. (Tr. 402). Throughout the course of her testimony, Plaintiff showed great difficulty in answering open-ended questions, especially regarding questions which asked her to describe the frequency of an event, and she also exhibited difficulty with understanding the questions themselves. (Tr. 377-402).

Plaintiff testified that she experiences panic attacks several times per week, generally lasting ten or fifteen minutes, and that her symptoms include extreme sweating,

shaking, shivering, shortness of breath, chest pains, and sitting in a daze. (Tr. 390, 398). Plaintiff also admitted to having trouble with her memory and frequently losing things (Tr. 401-402). She testified that she does not bother to get out of her nightclothes unless she has somewhere to go, and thus can go without dressing for even an entire week at a time; in addition, she showers only twice per week on average. (Tr. 401). Plaintiff maintained that she generally only eats one meal per day (*Id.*), and that she has no hobbies or friends (other than her daughters). (Tr. 393).

Regarding her activities of daily living, Plaintiff testified that she naps once or twice per day for at least a half an hour. (Tr. 387-388). She shares household chores with her adult daughters, but may sweep once or twice a week, and may assist with the laundry (which is located in the kitchen, so she does not need to carry the laundry basket). (Tr. 388-389). Plaintiff cooks something simple like hamburgers once or twice per week, and may help with washing dishes (although the latter chore is her daughters' responsibility). (Tr. 391-392). Plaintiff goes grocery shopping occasionally, but only with her daughters and while leaning on a grocery cart, and she may also sometimes visit the convenience store across the street from her house for a few items. (Tr. 391, 396-397). Plaintiff must rely on her daughters to carry the grocery bags into the house. (Tr. 397).

Plaintiff's brother, Walter Bowling, also testified at the hearing. (Tr. 404-408). Mr. Bowling's testimony was consistent with Plaintiff's allegations. Specifically, Mr. Bowling testified that Plaintiff has trouble with reading and math, and that he was helping her manage bills, read and understand her mail, and helped her fill out applications and

other paperwork. (Tr. 404-405). Mr. Bowling confirmed that Plaintiff was in special education classes while in school, and she also had frequent illnesses as a child. (Tr. 405). Mr. Bowling testified that Plaintiff is "not really a public person" and that her moods and responses to things were like "a roller coaster" (*Id.*) He further commented that Plaintiff seems more despondent now in comparison to when she was younger. (Tr. 406).

Mr. Bowling testified that Plaintiff does very little around the house and she tires easily and gets out of breath. (Tr. 406). He stated that Plaintiff is able to wash some dishes or run to the store for milk on occasion, but then she would lay down. (*Id.*) He noted that Plaintiff does not go out to visit with family or friends. (Tr. 405). Mr. Bowling concluded that, in his lay opinion, Plaintiff cannot sustain full-time work due to both her physical and mental impairments. (Tr. 407-408).

**B.**

Plaintiff's first objection is that the ALJ should have ordered IQ testing to determine whether she in fact had an IQ between 60 and 70 or whether instead she had only "borderline intellectual functioning."

The ALJ concluded that Plaintiff did not have an impairment or combination of impairments which met or medically equaled the Listings of Impairments. Specifically, the ALJ stated that "a consultative evaluation is not indicated because of the existence of school records and a complete set of mental treatment records. The school records do not provide substantial evidence that the claimant had the required deficits in adaptive

-8-

functioning before the age of 22."[2] The ALJ noted that there were no valid IQ scores in the record, and that the consultative examiner, Dr. Rosenthal, estimated that Plaintiff had borderline intellectual functioning.

Plaintiff argues that by refusing her request to order a psychological evaluation with IQ testing, the ALJ failed to fully and fairly develop the record. On October 15, 2008, Plaintiff's counsel made a formal written request for a full neuropsychological evaluation. (Tr. 333-334). This request was supported by the record itself, which raises the issue of whether Listing 12.05 might be met. In fact, an employee of the state agency which conducted an informal review of Plaintiff's claim while the claim was pending at the hearing level, specifically recommended neuropsychological testing because she also saw signs that Plaintiff might meet Listing 12.05C. (Tr. 135):

> **Note: Return to ODAR**
> Claim has been received and reviewed and attorney contacted and updated function report received. A review of the medical and other information notes that the claimant has a h/o significant alcohol intake. She also has borderline intellectual functioning (estimated IQ). The function report really is just a rehash of the ADLs from the CE that was done. *The claimant's IQ most certainly should be formally done as it is possible that the claimant may have IQ's in the 60's just as easily as "estimated" to be borderline. Although the case needs some work, if the claimant does have valid IQ's in the 60's she appears to have a significant 2nd mental impairment (Affective D/O) that would make her a 12.05C allowance.* Unfortunately the IQ's will have to

---

[2] As discussed *infra*, Plaintiff disagrees with the assertion that there is a "complete set of mental treatment records" (because Dr. Tepe's treatment records were not obtained); and Plaintiff disagrees with the assertion that she cannot prove that she had deficits in adaptive functioning which manifested prior to age 22 (since the school records clearly show a deficit in the academic domain, and the presence of specialized speech classes evidences that Plaintiff had a deficit in communication prior to age 22).

>>be obtained before this assessment can be made. Thus, the case is returned to OHIO ODAR for a formal hearing.

(*Id.*) (emphasis added).  This analysis by the state agency worker is an independent reason why the ALJ should have agreed to order neuropsychological testing.

In her post-hearing brief, Plaintiff cited to school records which show that Plaintiff has consistently performed very poorly in the academic sphere.  (Tr. 140-149).  Plaintiff concedes that IQ testing from that time period was not available, but points out that the Social Security Administration and the courts recognize that IQ scores become static in adulthood, and absent proof of an injury or illness which could cause a decrease in a person's IQ, an IQ score which post-dates a claimant's 22nd birthday may still be used to prove that the claimant has an IQ score between 60 and 70, as required by Listing 12.05C. *See* Listing 112.00(D)(10).  Therefore, the fact that Plaintiff's school records do not include any IQ scores is not a fatal flaw to her assertion that she will meet Listing 12.05C if IQ testing is provided, and it was wrong for the ALJ to use that fact as a reason not to order IQ testing.

The ALJ has a duty to fully and fairly develop the record in order to provide the claimant with a fair hearing. *Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986).  Here, the ALJ's findings are defective because he failed to develop the factual record fully and fairly. *Lashley v. Sec'y of Health & Human Services*, 708 F.2d 1048, 1051-52.  The lack of IQ testing in light of the impairments suggested by the school records and Plaintiff's physicians prevented fair review of Plaintiff's claim.  In

*Richardson v. Perales*, 402 U.S. 389 (1971), the Supreme Court explained that the ultimate responsibility for ensuring that every claimant receives a full and fair hearing lies with the administrative law judge.

The determination of whether the ALJ has failed to fully develop the record is made on a case-by-case basis by examining the record. *Lashley*, 708 F.2d at 1052 ("There is no bright line test for determining when the administrative law judge . . . failed to fully develop the record."). While "an ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). In this case, the record contained substantial evidence that Plaintiff had an intellectual deficit. 20 CFR §§ 404.1512(f), 416.912 provide that "[i]f the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense." The failure to exercise that discretion when the record is inadequate to assess the claimant's RFC is grounds for reversal. *Porzondek v. Comm'r*, No. 92-1323, 1993 U.S. App. LEXIS 1722 (6th Cir. Jan. 22, 1993). While this Court acknowledges that it is the claimant's burden to place a "complete and detailed" record before the ALJ, a cursory review of Plaintiff's school records indicate a serious intellectual deficiency which the ALJ could not ignore.[3]

---

[3] *See also* Hallex I-2-5-14 ("When the ALJ needs additional information about Claimant's impairment(s), he will determine if the information may be available from a treating source or other medical source. An ALJ is empowered to order consultative evaluations when there is insufficient evidence in the record and no further evidence is available."); Hallex I-3-7-

Although the ALJ's duty to fully develop the record is lessened to some extent when the claimant is represented by counsel, the duty nonetheless remains. Plaintiff's counsel's performance, coupled with the ALJ's failure to develop the record, should not operate to deprive the Plaintiff of the opportunity to obtain benefits to which she may be entitled.[4]

## C.

Plaintiff's second objection is that the Magistrate Judge erred in determining that the ALJ's decision was supported by substantial evidence, either regarding his decision that Plaintiff did not manifest at least two deficits in adaptive functioning prior to age 22 or that she had the functional capacity to perform and sustain work.

The ALJ reasoned that Plaintiff's school records do not provide evidence that she has at least two deficits in adaptive functioning which manifested prior to age 22. (Tr. 18). However, this is an incorrect characterization of the school records, as the records support a finding that Plaintiff had deficits in academic functioning and in social functioning prior to age 22.

First, as even the ALJ admitted, the school records show that Plaintiff "was always below average in all grades." (Tr. 18). Standardized testing results show that Plaintiff

---

11 ("The analyst should recommend a remand to obtain a CE(s) and/or medical test(s) when additional evidence is necessary to establish the nature, severity, and/or durations of the Claimant's impairment(s), and such evidence does not appear to be available from the Claimant's medical sources.").

[4] Plaintiff's attorney did not ignore the issue of the IQ test; rather the attorney zealously advocated for the testing. (Tr. 333-34).

generally performed at the 2nd to 4th stanine levels throughout her schooling; this indicates that she generally performed better than only 2%-4% of the national population for the items tested. (Tr. 143-148). In fact, during testing in 1980, when Plaintiff was 14 years old, she scored at the mental age of 7 years 3 months in Language skills and 10 years 11 months in non-language skills, for a total mental age of only 9 years. (Tr. 144). Plaintiff repeated the 1st and 5th grades and quit school after the 6th grade. (Tr. 141).

Second, the school records show that Plaintiff manifested a deficit in the area of communication prior to age 22. Specifically, the school records show that Plaintiff was in speech classes for at least the 1972-1973 school year. (Tr. 144). In addition, in March 1980, when Plaintiff was 14 years old and in the 6th grade, her reading comprehension score equated to only the second grade level.[5] (*Id.*) Thus, Plaintiff had difficulty with both oral and written communication. As such, the school records do in fact show that Plaintiff manifested deficits in adaptive function prior to age 22, as required by Listing 12.05C.

The ALJ also focused on Plaintiff's reported activities of daily living to show that she could not prove that she meets Listing 12.05C, despite IQ testing. For example, the ALJ stated that Plaintiff "kept up her personal care and her medication scheduling and took care of her dogs" (Tr. 19), and he repeatedly cited to the activities of daily living

---

[5] The Social Security Administration generally considers a person to be "functionally illiterate" if the person is "not able to read above a second grade level." *See, e.g., Olsen v. Schweiker*, 703 F.2d 751, 756 (3rd Cir. 1983).

attributed to Plaintiff through the description given by Dr. Rosenthal. However, the Sixth Circuit found in *Brown v. Sec'y of HHS*, 948 F.2d 268 (6th Cir. 1991), that the ability to use public transit, have a drivers license, visit friends, make change at a grocery store, do laundry, complete sixth grade, have a limited level of reading comprehension, and (in prior work) record mileage, hours worked, and places drove, are not inconsistent with a valid test IQ of 68, "and the Secretary offers no empirical evidence in support of this conclusion." (*Id.*)

There are many similarities between Plaintiff and Brown: both completed the 6th grade and have a "limited level of reading comprehension," both have driver's licenses, both do their own laundry, and (arguably) both can make change at a grocery store *(but see* Plaintiff's testimony at Tr. 391, *supra*). In fact, Plaintiff may have even fewer abilities to manage her own affairs independently: her family provides significant daily assistance with money management, administration of medications, and coordination of doctors' appointments. (Tr. 378-402). Furthermore, Plaintiff's ability to manage her personal hygiene and other activities of daily living may not be as developed as the ALJ suggests: Plaintiff has been described on several occasions throughout the record as being "disheveled" (and once was described as having a strong body odor (Tr. 331)), and Plaintiff testified that she generally will not bother to change out of her nightclothes unless she has somewhere to go (Tr. 320, 324, 331).

Next, the ALJ points to the fact that neither Dr. Rosenthal nor any other treating or examining mental health provider diagnosed Plaintiff with mental retardation. However, consultative examiners will not generally diagnose mild mental retardation unless they have had the chance to review school records. In Plaintiff's case, the state agency failed to obtain Plaintiff's school records, so Dr. Rosenthal did not have an opportunity to review those records before providing his opinion about Plaintiff's diagnosis; he also did not perform any neuropsychological testing. (Tr. 156-159). Similarly, Plaintiff's therapist did not have access to Plaintiff's school records and was not focusing the treatment goals on Plaintiff's cognitive functioning, and thus did not provide a diagnosis of mild mental retardation. (Tr. 320-327, 335-368).

Therefore, it was unreasonable for the ALJ to refuse to order neuropsychological testing to determine whether Plaintiff has the IQ scores required by Listing 12.05C. This error is not harmless, since there is a great deal of evidence in the record which fulfills the other elements of Listing 12.05C.

**D.**

Plaintiff's third objection is that the Magistrate Judge erred in determining that the ALJ properly evaluated Plaintiff's credibility and failed to evaluate the credibility of Plaintiff's brother's testimony.

It is within the discretion of the ALJ, who actually meets with and takes testimony from an individual plaintiff, to evaluate that plaintiff's credibility. As the Sixth Circuit

has found: "[i]t is for the [Commissioner], not a reviewing court, to make credibility findings." *Felisky*, 35 F.3d at 1036; *see also McGuire v. Comm'r of Soc. Sec.*, No. 98-1502, 1999 WL 196508, at *6 (6th Cir. Mar. 25, 1999) (*per curiam*) ("An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility."). The ALJ's credibility finding is entitled to considerable deference. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993) (ALJ's credibility findings should not be discarded lightly, and absent compelling evidence to the contrary, should be accorded deference). However, if the ALJ determines that the claimant's testimony is not credible, the ALJ must clearly state the reason for doing so. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ failed to provide specific reasons for finding Plaintiff less than credible and entirely ignored Plaintiff's brother's testimony.

In support of the ALJ's credibility finding, the Magistrate Judge notes that Plaintiff "reported to a treating provider that she planned to stop smoking in 2008, a goal she failed to put into action, notwithstanding repeated medical advice to quit." (Tr. 18 at 23).

Additionally, the Magistrate Judge notes that the records reflect "frequent no-shows and cancellations" for mental health appointments and notes frequent changes of doctors, gaps in treatment, and or frequently missed appointments. (*Id.*) The Magistrate Judge also cites inconsistencies in the record regarding Plaintiff's claim that she could not read and write, while the ALJ determined that Plaintiff "can read and write simple words, sentences, and paragraphs." (*Id.* at 23-24).

First, the fact that Plaintiff was unable to stop smoking does not support a finding that Plaintiff is not credible.[6] Second, Plaintiff's inability to keep appointments expressly ignores the allegations that Plaintiff's cognitive abilities prevented her from properly completing such activities. *See* SSR 96-7p, 1996 SSR LEXIS 4. Finally, a finding that Plaintiff could read and write is undermined by the record evidence.

Furthermore, the testimony of Plaintiff's brother, Mr. Bowling, corroborated Plaintiff's statements, therefore underscoring Plaintiff's credibility. Additionally, Mr. Bowling provided supplemental information about Plaintiff's level of functioning prior to the age of 22 and confirmed that she was in special education classes. The Regulations state that all evidence, including non-medical evidence from "other sources" (such as Mr. Bowling), should be taken into consideration. 20 CFR §§ 404.1513(d)(4) &

---

[6] "Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema and lung cancer – directly caused by smoking – who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop." *Shramek s. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (it was error to rely on failure to quit smoking as evidence of noncompliance with medical treatment and as a basis for a negative credibility finding).

416.913(d)(4). Additionally, Social Security Ruling 06-3p makes clear that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *See, e.g., Walter v. Astrue*, No. CIV-09-405-SPS, 2011 U.S. Dist. LEXIS 35352, at *4 (E.D. Ok. Mar. 30, 2011) (remanding for consideration of third-party witness statements in assessment of credibility). *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247-49 (6th Cir. 2007) (holding ALJ erred in credibility determination where ALJ failed to provide specific reasons for finding on credibility in relation to the entire case record).

Therefore, the ALJ failed to properly evaluate Plaintiff's credibility and failed to consider Mr. Bowling's testimony, as required by the Regulations.

## III.

A sentence four remand provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary. *See Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted). In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher,* 17 F.3d at 175. "It is well established that the party seeking remand bears the burden of showing

that a remand is proper under Section 405." *Culbertson v. Barnhart,* 214 F. Supp. 2d 788, 795 (N.D. Ohio 2002) (*quoting Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551 (6th Cir. 1984)).

## IV.

Based upon the foregoing, the Court concludes that remand is appropriate in this matter because there is insufficient evidence to support the ALJ's decision.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner to deny Tammy Johnston SSI benefits is **REVERSED**, the Magistrate Judge's Report and Recommendations (Doc. 18) is declined, and this matter is **REMANDED** to the ALJ under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Order.

On remand, the Commissioner shall: (1) obtain valid IQ scores for Plaintiff; (2) locate Plaintiff's mental health records from Dr. Tepe and/or CHC Mental Health (if feasible); (3) have Dr. Rosenthal supplement his comprehensive psychological evaluation after having reviewed Plaintiff's school records and IQ results; (4) consider Plaintiff's impairments when assessing her credibility; (5) consider the testimony of Mr. Bowling; and (6) reassess Plaintiff's RFC.

**IT IS SO ORDERED.**

Date:   3/27/12                                                                  *s/ Timothy S. Black*
                                                                                         Timothy S. Black
                                                                                         United States District Judge